ZOLKIN TALERICO LLP
Derrick Talerico (State Bar No. 223763)
dtalerico@ztlegal.com
David B. Zolkin (State Bar No. 155410)
dzolkin@ztlegal.com
12121 Wilshire Blvd., Suite 1120
Los Angeles, CA  90025
Telephone:    (424) 500-8551
Facsimile:    (424) 500-8951

Attorneys for Debtor and
Debtor-in-Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>JACKIE'S COOKIE CONNECTION, LLC,<br>a California limited liability company,<br><br>　　　　　Debtor and Debtor-in-Possession. | Case No. 2:18-bk-24571-NB<br><br>Chapter 11<br><br>**REPLY TO OPPOSITION OF OBJECTING CREDITORS TO MOTION FOR ORDER:**<br>**(1) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF PROPERTY FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS PURSUANT TO 11 U.S.C. § 363(B) AND (F); (2) APPROVING PROCEDURES RELATED TO THE ASSUMPTION OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO 11 U.S.C. § 365; (3) APPROVING THE FORM AND MANNER OF NOTICE; AND (4) APPROVING BUYER AS GOOD FAITH PURCHASER PURSUANT TO 11 U.S.C. § 363(M)**<br><br>**Hearing**:<br>Date:　　May 7, 2019<br>Time:　　2:00 p.m.<br>Place:　　Courtroom 1545<br>　　　　　255 East Temple Street<br>　　　　　Los Angeles, CA 90012 |

1     The "Objecting Creditors," (as defined in the Opposition to the Debtor's Sale Motion
2 [Dkt. 87]), clearly do not not want the Debtor's CEO, Rachel Galant, to receive court approval to
3 purchase the Debtor's assets. They use strong and feiry language in their Opposition like "stripping
4 the estate, "illusory purchase price," "a device…for self-dealing," a "scheme," a "miscarraige of the
5 bankruptcy process," and "stealing her company away from creditors." Upon reading the Opposition
6 one might think Ms. Galant were some criminal corporate raider, exposed by the Objecting
7 Creditors.
8     The Objecting Creditors have no basis for their slanderous remarks, nor do the facts support
9 their obstructionist efforts. The Debtor and Ms. Galant have been nothing less than fully transparent
10 with the Court throughout the Debtor's bankruptcy and in the Sale Motion. Ms. Galant started a
11 small family business to continue the legacy business began by her mother a generation earlier. As a
12 widow, raising two boys, Ms. Galant seized an opportunity to grow her business to support her
13 family. She took in financing to launch the acquisition and build-out of the Compton baking facility
14 (including the Objecting Creditors with convertible instruments and straight debt). She executed on a
15 business plan to leverage the new baking facility into greater sales…but ultimately, revenue could
16 not cover expenses, and the business failed. The Objecting Creditors lost a lot of money. Ms. Galant
17 lost more.
18     With enough equity in her home to make one last go of the cookie business (on a much
19 smaller scale than the Debtor's pre-petition operations), Ms. Galant has committed to write checks to
20 over-pay for the purchase of assets, as detailed in the Sale Motion.
21     But the Objecting Creditors find fault in Ms. Galant's offer. They are right to conclude that
22 they are not likely to have any recovery as a result of the sale to Ms. Galant. But what is their
23 alternative? Ms. Galant is offering to pay $100,000 for the Debtor's intellectual property and
24 miscellaneous personal property plus $450,000 for lease buyouts. As the Objecting Creditors'
25 counsel has been informed following the filing of their Opposition, the Debtor's registered
26 intellectual property consists of two trademarks, plus whatever rights in unregistered intellectual
27 property may exist. But the Objecting Creditors already knew that. They have had a front row seat to
28 the Debtor's operations since they invested, and have been "actively" involved in watching the

1  Debtor run out of capital, rebuffing pleas for further investment.

2  To not invest further is of course their right. It was their right pre-petition and it is their right
3  now. But to state that they would come in as a white knight with a bid greater than Ms. Galant's *and*
4  subordinate their claims but for the fact that they do not know what constitutes the Debtor's
5  intellectual property is a bit unbelievable. Other than Ms. Galant and the Debtor's executives,
6  nobody knows more about the Debtor's business than the Objecting Creditors.

7  Ms. Galant has turned over every rock to find an investor or other funding that could (1) have
8  avoided the bankruptcy, or (2) provide a return to unsecured creditors. Ms. Galant has asked the
9  Objecting Creditors for more investment, negotiated an investment from TV personality Marcus
10 Lemmonis, negotiated for a strategic purchase from larger cookie players, and consulted with
11 investment bankers, all of which Ms. Galant can testify to as the Sale Hearing. Ms. Galant also spent
12 more than two hours in mid-February meeting with Maurice Rasgon (one of the Objecting Creditors)
13 and a potential purchaser he identified in hopes of obtaining a bid or investment. That buyer declined
14 to make any offer.

15 From one side of their mouth the Objecting Creditors argue that they cannot place a bid
16 because of a lack of transparency…and from the other side of their mouth they complain that Ms.
17 Galant has rejected their offers to acquire the business. At the end of February, Objecting Creditor
18 Brian Haloossim made a "preliminary proposal" to Ms. Galant on behalf of at least himself and
19 Maurice Rasgon (and perhaps other Objecting Creditors). They would acquire the Debtor's assets to
20 re-start the company out of the Santa Monica Café. Ms. Galant would remain responsible for over
21 seven hundred thousand dollars of liability to equipment lessors and the Compton landlord. Ms.
22 Galant would own 20% of the new company and earn a guaranteed salary of $5,000 per month for 2
23 months. The full "preliminary proposal" is attached hereto as "**Exhibit 1**"). Although she was
24 hopeful that Brian and Maurice would propose something fair that could work for her, this proposal
25 would put Ms. Galant in an untennable financial position. Ms. Galant was willing to take a small
26 equity position, but the employment terms were far from anything she could consider.

27 The Objecting Creditors have known for a year or more that the Debtor needed more capital
28 in order to survive. They participated in meetings with the Debtor, they participated in meetings with

Marcus Lemmonis on terms of his proposed investment, they brought in potential strategic purchasers to meet with Ms. Galant, and they have made their own overtures for a future investment. But one thing they have not done, is make a firm offer to buy any of the Debtor's assets. They know the Debtor's business…and they know what it is worth.

Despite their claims that they did not know Ms. Galant was considering making an offer to buy the Debtor's assets until April 19 or 20, this is unlikely to be true. At the March status conference on the 26th, the Debtor's counsel stated that Ms. Galant would be the stalking horse bidder, to which the Objecting Creditors' counsel voiced his concern that Ms. Galant would attempt to steal the business away for pennies. In response, Debtor's counsel stated that her bid would be material and pleaded to all participating in the hearing to bring any and all offers for purchase of the Debtor's assets…that the Debtor was keen to receive any and all offers.

Despite the pleas – both prior to and during the bankruptcy – the Objecting Creditors have refused to offer so much as a dollar to buy any of the Debtor's assets. And now, in response to the Debtor providing for a bidding process free of any barriers or qualifications to submit offers, the Objecting Creditors find fault with this open bidding and ask the court to have the Debtor impose a more restrictive process. The Objecting Creditors also complain that the Debtor will not *really* consider all offers submitted because she will always select her own offer as the best. Maybe she will select her offer as the best among competing offers. But to date, there are no competing offers and at the Sale Hearing, if there are competing offers and the Debtor nevertheless asks the Court to approve her offer, the Court will have the terms of the other offers before it and will decide whether the offer submitted for approval is in the best interests of the Debtor's creditors.

The Debtor assets and business have had a fair exposure to the market. The Debtor searched for additional investment for months prior to the bankruptcy. Through "The Profit" show that aired during the bankrutpcy in February – which concluded with an explanation that the company filed for bankruptcy in hopes of restructuring – the Debtor's distress received national exposure.  By appropriately listing the sale on the court's website, the Debtor's assets were exposed to a specialized market of purchasers looking to buy assets or businesses out of bankruptcy. The fact is, the Debtor's business and assets are too small to warrant the attention of an investment banker or

some expensive marketing process. The Debtor had revenue of only a few thousand dollars per month since filing for bankruptcy, which is also public knowledge. It is not surprising that no offers for the Debtor's assets have been received, especially considering Ms. Galant's significant bid.

The Opposition reads mostly like a case of sour grapes. The Objecting Creditors are mad that they lost money. That is understandable. But it's not reasonable to attempt to derail a sale that will bring significant recovery to creditors with higher priorities than themselves, without offering any alternative or bid. Because they are unsecured, the Objecting Creditors would be out of the money at Ms. Galant's current bid. Ms. Galant is also out of the money. But approximately $550,000 will go to creditors. That's not "illusory," a "scheme," "stealing," or a "miscarraige of the bankruptcy process."

What would the Objecting Creditors like to see happen?  If a sale is not approved at the Sale Hearing, there is neither time nor money to run a bigger marketing process.  The Compton lease, where the majority of the Debtor's leased equipment is stored, will expire at the end of May. The Debtor will have to instruct the equipment lessors to immediately make arrangements to pick up their equipment. The US Trustee has a motion pending to convert or dismiss the case. That motion will likely be granted.  If that is the result, no creditors would benefit.  The Debtor respectfuly asks that the Court deny the Opposition, grant the Sale Motion, and approve a sale to the bidder(s) presented at the Sale Hearing for approval.

DATED:  April 30, 2019                    ZOLKIN TALERICO LLP


By:   /s/ Derrick Talerico
      Derrick Talerico
Attorneys for Jackie's Cookie Connection, LLC,
Debtor and Debtor-in-Possession

# EXHIBIT 1

**EXHIBIT 1**

**From:** Brian Haloossim <bfh24@yahoo.com>
**Date:** February 27, 2019 at 10:35:49 PM PST
**To:** Rachel@JackiesCookie.com
**Subject: Follow up**

Dear Rachel,

As a follow up, I wanted to send our preliminary proposal.

We would buy the assets of the company which includes the IP consisting of, but not limited to: the artwork, the website, the recipes, the customer list, any packing materials and packaging, etc. Any liabilities and/or debt outstanding would not be our concern.

We propose that you begin with 20% equity. You would receive 2.5% additional equity each year for the next two years for a potential total of 25% equity in total of the company. If there were a need to fund the company for any monetary requirements, you would be responsible for your portion of the equity that you own at the time.

So, for example, if we need to invest $200,000 to get the company up and running or to fund purchase orders, if you owned 20% at that time, you would be responsible for $40,000. We would not request that you invest this capital; but rather, we would accrue it on the company books as a loan to you, payable to the company. It would accrue interest at libor plus 2% interest. In the event that the company is sold, your payout would be reduced by the amount owed after repaying the debt to the company.

In the event that you leave the company, or your employment contract is terminated for cause, you will not retain any of the equity and your accrued loan will be forgiven. Any new products developed, new customers and distributors added, or any new IP developed would be the property of the new entity and not you or the old entity.

Initially, we would employ you as an independent contractor at a rate of $5,000 per month. For this, we would expect that you focus your time and efforts on the company for the first two (2) months. At the end of these two months, we would renegotiate your salary. At the end of the first two years, if you are still actively working in the company, we would reevaluate your salary.

You would be working with Maurice to help with the baking process, fulfilling orders, introducing him to the customers and distributors, and assisting with the relationship with the potential contract manufacturer, etc. In addition, if we continue after the first two months, we would expect a commitment to helping with PR and messaging. We don't expect this to be a full time job, but it will initially require at least 20 dedicated hours per week.

We are happy to come up with a title that works for you. Perhaps, you could remain the Founder and President. Please note that control of the company and day to day oversight would be the purview of Maurice and the board. You would be the only person from the old company that we would work with. We would respectfully request that David Sonkin not be involved or be privy to the goings on in the company.

Initially, we would expect to manufacture out of the Santa Monica facility. During that time, we would be responsible for the rent, believed to be $6,000 per month, as well as any additional expenses such as utilities and employees. We would NOT assume responsibility for the duration of the rent which is believed to be December of 2019. We are aware that there is a credit of three months which consists of first, last and security. If the bankruptcy court rules that this is an asset of the company, we would acquire this credit and we would apply it to the outstanding rent.

We believe this proposal will allow us all to put our efforts toward keeping the brand moving forward and stabilizing the company. It will allow the story and the name to survive and regain momentum. We will start by cutting costs and increasing our margins.

Eventually, we will be bringing another operator on board to run the company and allow Maurice to simply be an owner and board member.

Let me know your thoughts and if you want to discuss in more depth.

Brian

Brian Haloossim

Sent from my iPhone

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
12121 Wilshire Blvd, Suite 1120, Los Angeles, CA 90025

A true and correct copy of the foregoing document entitled (*specify*): **REPLY TO OPPOSITION OF OBJECTING CREDITORS TO DEBTOR'S MOTION FOR ORDER: (1) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF PROPERTY FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS PURSUANT TO 11 U.S.C. § 363(B) AND (F); (2) APPROVING PROCEDURES RELATED TO THE ASSUMPTION OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO 11 U.S.C. § 365; (3) APPROVING THE FORM AND MANNER OF NOTICE; AND (4) APPROVING BUYER AS GOOD FAITH PURCHASER PURSUANT TO 11 U.S.C. § 363(M)**, will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) April 30, 2019, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

US Trustee's Office: ustpregion16.la.ecf@usdoj.gov; dare.law@usdoj.gov
Attorneys for Debtor: Derrick Talerico: dtalerico@ztlegal.com; maraki@ztlegal.com; sfritz@ztlegal.com
Attorneys for Unsecured Creditor Smashssma LLC: Michael S. Kogan: mkogan@koganlawfirm.com
Attorneys for Creditor Continental Bank: Brett H. Ramsaur: brett@ramsaurlaw.com
Unsecured Creditor Synchrony Bank by PRA Receivables Management LLC, Authorized Agent: Valerie Smith: claims@recoverycorp.com
Attorneys for Creditor Direct Capital Corporation: Raffi Khatchadourian: raffi@hemar-russo.com
Attorneys for Creditor Honda Lease Trust: Vincent V Frounjian: vvf.law@gmail.com
Attorneys for Creditor Ally Bank: Adam N. Barasch: adb@severson.com; cas@severson.com; nye@severson.com
Attorneys for Creditor Brian Haloossim: Sandford L. Frey: sfrey@leechtishman.com; lmoya@leechtishman.com; dmulvaney@leechtishman.com
Attorneys for Kogan Law Firm: Michael S. Kogan: mkogan@koganlawfirm.com

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**: On (*date*) April 30, 2019, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Debtor:
Jackie's Cookie Connection, LLC
Attn Rachel Galant, CEO
12109 Santa Monica Blvd.
Los Angeles, CA 90025

Creditor:
Continental Bank
c/o Bradley R Jones, Vice President
15 W South Temple, Ste 300
Salt Lake City, UT 84101

Creditor:
Budget Uniform Rental Inc.
c/o Caleb Donner Esq.
Donner & Donner
910 Hampshire Rd Ste R
Westlake Village, CA 91361

Creditor:
Wells Fargo Bank N.A.
800 Walnut St MACF0005-055
Des Moines, IA 50309

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 30, 2019 | Martha Araki | */s/ Martha Araki* |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.